Lawrence M. Rolnick
Marc B. Kramer
Michael J. Hampson
ROLNICK KRAMER SADIGHI LLP
1251 Avenue of the Americas
New York, New York 10020
Tel.: (212) 597-2800
Fax: (212) 597-2801
lrolnick@rksllp.com
mkramer@rksllp.com
mhampson@rksllp.com
*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| STARBOARD VALUE AND OPPORTUNITY C LP, STARBOARD VALUE AND OPPORTUNITY MASTER FUND LTD, STARBOARD LEADERS KILO LLC, STARBOARD LEADERS SELECT III LP, and STARBOARD VALUE AND OPPORTUNITY S LLC, <br><br> Plaintiffs, <br><br> v. <br><br> PERRIGO COMPANY PLC, JOSEPH PAPA, and JUDY BROWN, <br><br> Defendants. | Civil Case No. _____ <br><br> **JURY TRIAL DEMANDED** <br><br><br><br><br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ..................................................................................2

II.     JURISDICTION AND VENUE ...........................................................................5

III.    PARTIES ...............................................................................................................5

        A.      Plaintiffs ...................................................................................................5

        B.      Defendants ................................................................................................6

IV.     FACTUAL ALLEGATIONS ...............................................................................7

        A.      Perrigo's History and Business ................................................................7

        B.      Regulation of the Pharmaceutical Industry and Generic Drugs..............9

        C.      Perrigo Engages in Anti-Competitive Practices to Boost Its Generic Rx Results While Misleading Investors ..................................................11

                1.      Divvying Up the Market Between 2010 to Early 2012 ...........18

                2.      Collusive Price Increases Between 2012 and 2016 ..................24

                3.      Price Increases Slow in the Wake of Increased Regulatory Scrutiny ....................................................................................33

        D.      Perrigo Is Criminally Investigated .......................................................34

V.      FALSE AND MISLEADING STATEMENTS AND OMISSIONS................35

VI.     ADDITIONAL ALLEGATIONS OF SCIENTER.............................................42

VII.    PRESUMPTION OF RELIANCE ....................................................................49

VIII.   PLAINTIFFS' ACTUAL RELIANCE ..............................................................50

IX.     LOSS CAUSATION...........................................................................................51

X.      NO SAFE HARBOR ..........................................................................................54

XI.     CLAIMS FOR RELIEF .....................................................................................55

JURY DEMAND ..............................................................................................................59

Plaintiffs Starboard Value and Opportunity C LP, Starboard Value and Opportunity Master Fund Ltd, Starboard Leaders Kilo LLC, Starboard Leaders Select III LP, and Starboard Value and Opportunity S LLC (collectively, "Plaintiffs") are purchasers of the publicly traded securities of Perrigo Company plc ("Perrigo," or the "Company"). Plaintiffs, through their undersigned attorneys, by way of this Complaint and Jury Demand, for their federal securities claims against Perrigo and its former executive officers Joseph Papa ("Papa") and Judy Brown ("Brown") (collectively, the "Individual Defendants," and, together with Perrigo, "Defendants"), allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.[1]

Plaintiffs' information and belief is based on, *inter alia*, an investigation by their attorneys, which investigation includes, among other things, a review and analysis of: Perrigo's filings with the United States Securities and Exchange Commission ("SEC"); public documents and media reports concerning Perrigo; analyst reports concerning Perrigo; transcripts of Perrigo conference calls and earnings calls; pleadings and documents filed in the matter *Roofers' Pension Fund v. Perrigo Co. plc, et al.*, No. 16-2805 (D.N.J.) (the "Class Action"); and pleadings and documents filed in the matter *State of Connecticut, et al. v. Sandoz, Inc. et al.*, No. 2:20-cv-035390 (E.D. Pa.) (the "State AGs Action"). Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

---

[1] L. Civ. R. 10.1 Statement: Plaintiffs are investment entities whose investment adviser has its principal place of business at 777 Third Avenue, New York, New York 10017; Defendant Perrigo has its corporate headquarters at The Sharp Building, Hogan Place, Dublin 2, Ireland D02 TY74, and has its North American Base of Operations at 515 Eastern Avenue, Allegan, Michigan 49010; Defendant Papa's address is 9 Springcroft Road, Far Hills, NJ 07931; and Defendant Brown's address is 3833 Hayvenhurst Drive, Encino, California 91436.

I.      **NATURE OF THE ACTION**

1.      This is an action to recover significant investment losses suffered as a result of a massive fraud that led investors to believe that Perrigo – a leading generic drug manufacturer – was experiencing strong financial growth over a number of years based on fundamentally sound business practices when, in fact, Perrigo's performance was being driven in part by an illegal practice of colluding with other drug manufacturers to systematically increase the price of generic drugs.

2.      Although competition in the generics market is meant to drive the price of those drugs down to just a fraction of the price of their brand-name equivalents, in this case, Perrigo and its "competitors" manipulated the system to ***exponentially increase*** the price of topical products. This conduct not only defrauded investors like Plaintiffs who purchased Perrigo stock, but also harmed patients who needed important medications.

3.      The State of Connecticut and fifty-one additional states and U.S. territories have filed a complaint against Perrigo detailing the collusive conduct.  That action is based on a multi-year, non-public investigation, during which government investigators had access to millions of documents and obtained evidence from numerous cooperating witnesses.

4.      The results of that investigation are indisputable.  According to the government, Perrigo's "anticompetitive conduct – schemes to fix and maintain prices, allocate customers, and otherwise thwart competition – has caused, and continues to cause, significant harm to the United States' healthcare system."

5.      Moreover, the government has placed the blame at the feet of Perrigo's senior-most executives.  The price-fixing scheme was orchestrated by "the ***executives and others at the highest levels*** . . . – including [Perrigo's Executive Vice President and General Manager, Pharmaceuticals

and its Senior Vice President of Commercial Operations] – *[who] conceived, implemented, directed, and ultimately benefited financially from these schemes*."[2]

6.     Perrigo profited handsomely from its collusion with other drug manufacturers in fixing the prices of topical generic drugs.  Between 2008 and 2016, Perrigo's profits from the sale of generic topical products increased by over 1300%.

7.     In its fiscal year 2015, Perrigo's generics segment's operating income was 1648% higher than it was in 2008.  The segment's net sales revenue was just over $1 billion in 2015, which was over $800 million more than it made in 2008.

8.     Publicly, Perrigo told investors that it was operating in a highly competitive environment and that it faced vigorous competition from other pharmaceutical companies that would drive down prices on generics.  Privately, however, Defendants knew that the profits being generated from the generics segment had been driven by anticompetitive conduct.  Thus, investors like Plaintiffs were led to believe that Perrigo's impressive profits from its generics division were based on a lawful, sustainable business practices when, in fact, they were the result of improper collusion between Perrigo and other manufacturers.

9.     This collusive price-fixing strategy was inherently risky and unsustainable.  The appearance of price gouging or collusion could draw public outrage, law enforcement scrutiny, and civil and criminal liability.  The inflated profits could vanish as quickly as they appeared. Indeed, Perrigo and the other manufacturers had to significantly dial back the price fixing as the increases in generic drug prices became the subject of regulatory and media scrutiny.

10.     Defendants made materially false and misleading statements, and omitted to disclose material information, concerning Perrigo's generics business, which caused the stock

---

[2] Bold and italic emphasis has been added to quotations throughout this complaint unless otherwise noted.

price of Perrigo to be artificially inflated.  In particular, Defendants falsely attributed the success of the generics segment to legitimate business practices and emphasized the competition for generic products when, in fact, Perrigo had been colluding with other manufacturers to thwart competition and to increase prices on generic drugs.  When increased regulatory scrutiny prevented Perrigo from continuing to increase prices, Perrigo failed to disclose that dwindling margins in the generics business were the result of the difficulty it was experiencing replicating collusive price increases in the face of such scrutiny.

11.     The market began to learn of Perrigo's collusive and anticompetitive conduct with respect to its generics segment in March 2017, when it was announced that Perrigo was the target of a criminal investigation concerning generic drug pricing.  Specifically, on March 3, 2017, *Bloomberg* reported that Perrigo's name had been raised by antitrust regulators at the Department of Justice.  Then, in May 2017, Perrigo revealed that its offices had been raided as part of an ongoing investigation by the Department of Justice into price-fixing in the pharmaceutical industry.  The price of Perrigo's common stock dropped precipitously in response to this news.

12.     Plaintiffs are investment funds that purchased Perrigo common stock during the time when, unbeknownst to them, Defendants were making materially false and misleading statements, and failing to disclose material information, which caused the price of these securities to be artificially inflated.  As the truth was gradually released, Plaintiffs suffered significant investment losses.

13.     The revelation of this fraud has caused Plaintiffs significant economic harm. Plaintiffs therefore bring this action under the federal securities laws to recover the losses they suffered as a result of Defendants' securities fraud.

## II.   JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

15.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

16.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391.

17.     In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the United States mails, interstate telecommunications, and the facilities of the New York Stock Exchange ("NYSE").

## III.   PARTIES

### A.   Plaintiffs

18.     Plaintiff Starboard Value and Opportunity C LP is a Delaware limited partnership whose investment adviser has its main office location in New York, New York.  A list of the dates on which it purchased Perrigo common stock in the United States is attached hereto as Exhibit A.

19.     Plaintiff Starboard Value and Opportunity Master Fund Ltd is a Cayman Islands exempted company whose investment adviser has its main office location in New York, New York.  A list of the dates on which it purchased Perrigo common stock in the United States is attached hereto as Exhibit B.

20.     Plaintiff Starboard Leaders Kilo LLC is a Delaware limited liability company whose investment adviser has its main office location in New York, New York.  A list of the dates on which it purchased Perrigo common stock in the United States is attached hereto as Exhibit C.

21.     Plaintiff Starboard Leaders Select III LP is a Delaware limited partnership whose investment adviser has its main office location in New York, New York.  A list of the dates on which it purchased Perrigo common stock in the United States is attached hereto as Exhibit D.

22.     Plaintiff Starboard Value and Opportunity S LLC is a Delaware limited liability company whose investment adviser has its main office location in New York, New York.  A list of the dates on which it purchased Perrigo common stock in the United States is attached hereto as Exhibit E.

23.     At all relevant times, Starboard Value LP ("Starboard") acted as investment adviser to Plaintiffs in connection with their purchases of Perrigo securities.

### B.     Defendants

24.     Defendant Perrigo is the world's largest manufacturer of over-the-counter healthcare products. Perrigo is also a significant supplier of generic pharmaceuticals.  Initially founded in 1887 and based for most of its existence in Allegan, Michigan, in 2013 Perrigo redomiciled as an Irish corporation with corporate headquarters in Dublin, Ireland.  At all periods relevant hereto, Perrigo had significant operations in New Jersey, including a 14,000 square foot research and development facility in Piscataway.  Perrigo described its Piscataway facility as a "strategic location in the hub of New Jersey's pharmaceutical industry" that "gives Perrigo a footprint in the northeast."   Perrigo's common stock trades on the NYSE under the symbol "PRGO."

25.     Defendant Papa joined Perrigo in October 2006 as its President and Chief Executive Officer ("CEO") and served in that capacity until April 25, 2016.  Papa was also a Director of Perrigo between November 2006 and April 2016.  Papa is currently President and Chief Executive Officer of Bausch Health Companies Inc. (f/k/a Valeant Pharmaceuticals International, Inc.).

26.     Defendant Brown served as Perrigo's Chief Financial Officer ("CFO") from July 2006 until her resignation on February 27, 2017.

## IV.     FACTUAL ALLEGATIONS

### A.     Perrigo's History and Business

27.     Perrigo is a specialty pharmaceutical company.  It is a provider of over-the-counter ("OTC") health and wellness products, and also produces generic prescription pharmaceutical topical products such as creams, lotions, gels, and nasal sprays.

28.     Perrigo is the successor to a Michigan corporation that began in 1887 as a seller of packaged goods.  For more than a century, Perrigo was a slow-growing manufacturer and distributor of healthcare products based in Allegan, Michigan, and operating primarily in the United States.  At that time, Perrigo focused on store brand versions of popular OTC products such as analgesics and cough syrup, which remain mainstays of the Company to this day.

29.     After Defendant Papa became CEO and Chairman of Perrigo's Board in October 2006, the Company adopted a "roll-up" strategy, becoming a serial acquirer of healthcare companies.  Through these acquisitions, Perrigo grew its core OTC business and expanded into markets like generic prescription drugs.

30.     In December 2013, Perrigo completed its corporate "inversion" transaction with Elan, an Irish corporation.  The tax inversion reportedly allowed Perrigo to save $150 million per year, primarily from avoiding U.S. taxes it would otherwise have to pay.

31.     Although the inversion transaction made Perrigo an Irish corporation, Perrigo continued to operate primarily from the U.S.

32.     Throughout the relevant period, Perrigo segmented its results into five major divisions:

- Consumer Healthcare ("CHC"):  Perrigo's CHC unit marketed primarily unbranded and store brand OTC store brand analgesics, cough syrups, smoking cessation products, gastrointestinal remedies, supplements and animal healthcare products.  This segment also included nutritional products, such as infant formula, which had previously been reported separately, and its Israeli-based pharmaceutical and diagnostic business, which had previously been reported as "Other."  According to its SEC filings, the CHC division marketed over 4,900 products during the relevant period.  During the six months ended December 31, 2015, the CHC segment represented approximately 50% of consolidated net sales.

- Branded Consumer Healthcare ("BCH"):  BCH contained the Omega businesses, as well as a German supplement brand called Yokebe purchased in 2015, and additional European OTC brands purchased from GlaxoSmithKline in 2015.  As of June 27, 2015, the BCH unit marketed approximately 5,200 branded OTC products in Europe, focusing on natural health, vitamins, supplements and minerals, cough and cold, allergy, skin care, weight management, pregnancy and fertility products, sleep aids, and anti- parasitic products such as lice treatments.  During the six months ended December 31, 2015, the BHC segment represented approximately 23% of consolidated net sales.

- Generic Rx:  Perrigo's "Rx" unit offered approximately 800 generic prescription drug products (including otherwise OTC drugs that are sold through the prescription channel to obtain reimbursement, which Perrigo calls ORx).  The Generic Rx unit focused on "extended topical" treatments, such as creams, ointments, gels, sprays, foams, powders, suppositories and shampoos.  During the six months ended December 31, 2015, the Generic Rx segment represented approximately 20% of Perrigo's consolidated net sales.

- Specialty Sciences:  Specialty Sciences consisted of the royalty stream Perrigo received from Biogen for Biogen's sales of Tysabri. Perrigo was entitled to a royalty rate of 18% of annual worldwide sales of Tysabri up to $2.0 billion, and 25% of sales above $2.0 billion.  During the six months ended December 31, 2015, Specialty Sciences was reported to represent approximately 6% of Perrigo's consolidated net sales.

- Other:  This division included Perrigo's Active Pharmaceutical Ingredient ("API") business, which manufactures active ingredients sold to other healthcare companies. While Perrigo does not separately report a percentage of total sales figure for the "Other" Segment, deducting the percentages represented by the remaining

segments, this segment contributed approximately 3% to the Company's net sales in the six months ended December 31, 2015.

**B.** **Regulation of the Pharmaceutical Industry and Generic Drugs**

33.     The manufacture and commercial sale of pharmaceutical drugs in the United States is regulated by the Food and Drug Administration ("FDA") under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq*. Prescription drugs marketed in the United States must be approved by the FDA. To obtain such approval, the manufacturer of a new drug must submit a new drug application ("NDA") that demonstrates, among other things, a drug's safety, clinically proven effectiveness, composition, and patent coverage. Thus, the NDA must contain extensive data gathered from animal studies and human clinical trials.

34.     Branded drugs approved under an NDA enjoy a period of market exclusivity that can be tremendously profitable for the drug manufacturer because there is no generic competition for the drug. This exclusivity period typically lasts for seven years. Once the exclusivity period ends, generic drugs can enter the market, creating pricing competition for the branded drug.

35.     Generic drugs are drugs that enter the market after a patent monopoly has expired. Because they must be demonstrably equivalent in therapeutic effect to the branded drug, they are differentiated only by price.

36.     To speed the entry of generic drugs and to facilitate price competition with branded drugs, Congress passed the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act"). Under the Hatch-Waxman Act, generic drug manufacturers may receive FDA approval for generic drugs without replicating the costly and time-consuming clinical trials involved in an NDA. Instead, the proponent of the generic drug need only demonstrate that it performs in the same way as the branded drug. Accordingly, instead of submitting an NDA, a

generic drug manufacturer may submit an abbreviated new drug application ("ANDA") and incorporate data, such as clinical studies, that the NDA filer submitted to the FDA.

37.     To be approved, an ANDA must demonstrate that the generic drug:  (a) has the same active ingredients as; (b) is pharmaceutically equivalent to (same dosage form and strength); and (c) is bioequivalent to (exhibiting the same drug absorption characteristics) the previously approved drug.

38.     The FDA publishes a list of all approved drugs and therapeutic equivalents in the Approved Drug Products with Therapeutic Equivalence Evaluations (commonly referred to as the "Orange Book").

39.     In functioning markets, generic drugs should provide substantial price breaks for consumers as increased competition drives prices towards the marginal cost of production.

40.     As generic drugs become available, lower-priced generic competitors should be rapidly substituted for their brand-name counterparts because the Hatch-Waxman Act and most state drug product selection laws permit (or require) pharmacists to substitute a generic drug for the branded version unless the prescription is specifically designated otherwise.

41.     Manufacturers of brand-name drugs typically should lose 80% or more of their sales to generic competition soon after a generic competitor enters the market.  Until a generic becomes FDA approved, however, a branded manufacturer may continue to charge supra-competitive prices.

42.     Simply put, the entrance of generic drugs into the market should – in theory – result in patients paying the lowest price for the drug that a competitive market can bear to produce the drug.

43.     Indeed, the FDA has determined that prices should decline substantially where at least two generic manufacturers have entered the market:



Source: FDA analysis of retail sales data from IMS Health, IMS National Sales Perspective (TM), 1999-2004, extracted February 2005

44.     A Federal Trade Commission ("FTC") study reached the same conclusion, finding that "in a mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug prices."  FTC, *Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions* (Jan. 2010).

C.     **Perrigo Engages in Anti-Competitive Practices to Boost Its Generic Rx Results While Misleading Investors**

45.     During the relevant time period, Perrigo's operating segment with the greatest impact on earnings was not its consumer healthcare (CHC) division, but Generic Rx.  Between the fourth quarter of 2013 and the first quarter of 2015, for example, Perrigo's Generic Rx segment ranked first among the Company's operating divisions in terms of adjusted net operating income in all but one quarter.

46.     Perrigo claimed to enjoy these margins because the topical generic sector in which it focused was difficult for competitors to enter.  For example, at the J.P. Morgan Healthcare Conference on January 13, 2014, Defendant Papa told analysts that:

> Our Rx segment, generic Rx segment, has been a real star for us. This segment has really been a focus on going after products that are generic equivalent products, but importantly staying away from just the simple oral tablet and going after what we call extended topicals. And by extended topicals, they fall under the category of dermatology, absorb topically through the skin; respiratory, absorb topically through the lungs; nasal products, absorb topically through the nasal mucosa; ophthalmic and otic are the areas that we predominantly focus on.  And the reason why that's important is that it's much harder to bring these products to the market, to be clear.
>
> But once you get them to the marketplace, they're much harder for other competitors to come in the space.

In other words, as Papa explained, Perrigo had "unique positioning" because its Generic Rx business was focused on products where it could be "one of . . . two or three players entering a market rather than 1 of 20 players."

47.     However, unbeknownst to the market, Perrigo's Generic Rx unit relied on anti-competitive practices to generate its "star" performance.  In contrast to the price declines that are typically associated with maturing generic markets, Perrigo relied on collusion with other manufacturers of generic drugs, or in some cases took advantage of pre-existing price-fixing conspiracies, to engage in unprecedented price hikes that could never be accomplished in a competitive market.

48.     As has now been detailed at length in filings in the State AGs Action against Perrigo, between 2009 and 2016, there was "rampant" collusion between Perrigo and other manufacturers of topical generic drugs.

49.     Specifically, Perrigo had years-long agreements with other prominent topical manufacturers to not compete with each other and to systematically and collectively increase prices

on their drugs.  Perrigo had these agreements with, among others, G&W Laboratories ("G&W"), Sandoz, and Taro Pharmaceuticals ("Taro").

50.     According to filings in the State AGs Action, Perrigo and these other pharmaceutical companies "stayed in nearly constant communication – meeting regularly at trade shows and customer conferences and communicating frequently by phone and text message to reinforce their understandings."

51.     Perrigo's collusion with other topical drug manufacturers involved a two-step process.

52.     First, the manufacturers agreed that when a new participant entered the market for a particular drug, that participant would not compete with the other manufacturers to drive down the price of the drug, but instead would be allocated its "fair share" of the existing market.  For example, if there were only two generic manufacturers for a particular drug, they generally would split the market equally into two.  If a third manufacturer entered the market, each manufacturer would agree to a 33% share.  If one company had initially had exclusivity with respect to a particular drug, it generally would be entitled to a slightly higher share of the market than the others.  Although there was no precise method for apportioning "fair share," the goal and understanding of all involved was to maintain the status quo in a way that one manufacturer was not incentivized to drive down the price of the drug.

53.     For example, in April 2010, Perrigo entered the market for Imiquimod Cream, where Fougera Pharmaceuticals ("Fougera") had previously enjoyed exclusivity.    A contemporaneous email from a Fougera senior executive obtained by the State AGs stated that "Perrigo is satisfied with 35-40% share" because "***any further attempts to gain share would result in driving prices down . . . and no one wins in that scenario***."

54.     In sum, and according to the State AGs, "[r]ather than enter a particular generic drug market by competing on price in order to gain market share, *competitors in the generic drug industry would systematically and routinely communicate with one another directly and divvy up customers to stifle price competition and maintain artificially higher prices*."

55.     Once the market had been apportioned, the second step in the collusive scheme involved *increasing* the prices on the topical treatments.  If one company increased its price, the other manufacturers would either decline to bid for the business or would overbid the price increase.  Generally, the other manufacturers would then follow suit and initiate a comparable price increase on their own product.

56.     These price increases were particularly aggressive in 2013 and 2014.  Perrigo implemented the largest price increase in July 2014, when is raised the wholesale acquisition cost ("WAC") of Econazole *by 736%*.

57.     Perrigo solidified its participation in this unlawful scheme when it hired Douglas Boothe ("Boothe") in January 2013 as Executive Vice President and General Manager, Rx Pharmaceuticals.  In that role, Boothe took charge of Perrigo's Generic Rx division.

58.     Boothe previously worked for another pharmaceutical company – Actavis.  Once at Perrigo, Boothe leveraged the relationships he had developed at Actavis to collude with other drug manufacturers on pricing issues.

59.     The generic drug market is structured in a way that allows manufacturers to frequently interact and communicate with each other.  Many large wholesalers and distributors of generic drugs hold multi-day conferences and invite companies like Perrigo to attend.

60.     There are also a variety of industry trade shows – including those hosted by the National Association of Chain Drug Stores ("NACDS"), the Healthcare Distribution Management

Association ("HDMA," n/k/a Healthcare Distribution Alliance), the Generic Pharmaceutical Association ("GPhA" n/k/a the Association for Accessible Medicines), and the Efficient Collaborative Retail Marketing Company, LLC ("ECRM") – at which individuals from different manufacturers get together.

61.     Many of these conferences and trade shows include social events such as golf outings, lunches, cocktail parties, and dinners that provide additional opportunities for generics manufacturer executives to meet with each other.

62.     In addition, executives of various generics companies would get together periodically for "industry dinners" or golf outings.  For example, Boothe met with executives from Actavis, Aurobindo, and Lannett at a steakhouse in Bridgewater, New Jersey for one of these industry dinners in January 2014.

63.     Ultimately, Perrigo profited handsomely from its collusion with other drug manufacturers in fixing the prices of topical generic drugs.  ***Between 2008 and 2016, Perrigo's profits from the sale of generic topical products increased by over 1300%***.

64.     In its fiscal year 2015, Perrigo's Generic Rx segment's operating income was ***1648% higher*** than it was in 2008.  The segment's net sales revenue was just over $1 billion in 2015, which was over $800 million more than it made in 2008.  This increased performance was directly tied to the price increases (explained in more detail below) made by Perrigo on a number of generic drugs, including:  Nystatin Ointment in June 2011; Halobetasol Cream and Ointment in March 2013; Ciclopirox Solution, Hydrocortisone Valerate Cream, and Promethazine HCL Tablets in August 2013; and Econazole Nitrate Cream, Hydrocortisone Acetate Suppositories, and Hydrocortisone Valerate Cream in July 2014.

65.    As a result of these price increases, the performance of Perrigo's Generic Rx segment during the relevant time period was far superior to Perrigo's other business segments. While the Generic Rx segment's operating income grew 1647%, Perrigo's operating income for all its operations when combined grew only 278%. Similarly, while the Generic Rx segment's net sales revenue grew 521%, Perrigo's net sales revenue for all its operations when combined was only 153%.

66.    These impressive financial results caused the stock price of Perrigo to be artificially inflated. Publicly, Perrigo told investors that it was operating in a highly competitive environment and that it faced vigorous competition from other pharmaceutical companies that would drive down prices on generics. Privately, however, Defendants knew that the profits being generated from the Generic Rx segment had been driven by anticompetitive conduct. Thus, investors were led to believe that Perrigo's impressive profits from its Generic Rx division were based on a lawful, sustainable business practices when, in fact, they were the result of improper collusion between Perrigo and other manufacturers.

67.    Whenever Perrigo's pricing practices were questioned, Defendants would publicly deny any improprieties. For example, in July 2016, the *Wall Street Journal* published an article about Defendant Papa's hiring as the new CEO of Valeant. In that article, it was noted that Perrigo had raised the prices on several generic drugs in 2013 and 2014. In response to those allegations, Defendant Perrigo and Defendant Papa were quoted as follows:

> Perrigo says competition from other generic drug companies making the same drugs played a role in its price increases. The products on which it raised prices are "in competitive markets . . . and like any business we take our competitors' pricing into account," a Perrigo spokeswoman said.
>
> Mr. Papa said the list-price increases are misleading, because they don't reflect what is paid after Perrigo provides discounts. Mr. Papa

wouldn't provide information on how much prices rose after discounts, saying that was confidential.

Prescription drugs accounted for a relatively small portion of Perrigo's revenue—roughly 20%—and prices were "flat to up slightly" across the entire portfolio, he said, including store-brand infant formula and over-the-counter drugs as well as generics.

68.     However, as has now been revealed, these statements were false and highly misleading because Perrigo had been colluding with other manufacturers to substantially increase the prices on generic drugs.

69.     Plaintiffs in the Class Action retained an economic expert experienced in investigating antitrust allegations to examine Perrigo's pricing practices with respect to generics drugs.  The Class Action plaintiff's expert determined that there were strong indicia of collusion, including dramatic price hikes contemporaneous with competitors following industry conferences and the absence of price variances following these hikes.  The expert observed this behavior in the following Perrigo generic drugs:  Desonide Cream and Ointment, Econazole Cream, Permethrin Cream, Tretinoin Cream, Clobetasol Gel and Foam, and Halobetasol Cream and Ointment.  Each of those drugs had a highly concentrated market structure susceptible to collusion, inelastic demand because most of the price increases fell to third-party payors, and high barriers to entry due to the requirement that new competitors first obtain an ANDA from the FDA.  Finally, according to the expert retained by the plaintiffs in the Class Action, there were no non-collusive factors that could explain the rapid and coordinated price increases initiated by Perrigo and its so-called "competitors."

70.     The investigation by the Attorney General of Connecticut – which included the review of thousands of documents and millions of phone records, and interviews with an untold number of cooperating witnesses – has corroborated these conclusions.

71.     The information in the following two sections summarizes some of the findings of the Attorney General of Connecticut revealed in 2020 based on its multi-year investigation of Perrigo.

### 1.     Divvying Up the Market Between 2010 and Early 2012

72.     Perrigo was a key manufacturer of topical generic products between 2010 and 2012. In addition to their ongoing understanding not to cut into each other's market share or erode prices, Perrigo and other manufacturers of these drugs met regularly with each other at conferences and trade shows.  They also spoke frequently via phone.  During these meetings and conversations, these so-called "competitors" discussed customer allocation and coordination of price increases on common products.

73.     One sales executive at Perrigo – referred to in the State AGs' complaint by the initials "T.P." – had a collusive relationship with a sales executive at Fougera.  Although they were not friends socially, they met at trade shows and conferences, and spoke over 300 times by phone between February 2010 and August 2010 to discuss pricing and market share.

74.     T.P. also had a collusive relationship a sales executive at Actavis, with whom T.P. discussed market allocation and coordinated price increases on products where Actavis and Perrigo overlapped.  Between August 2011 and December 2013, they exchanged over 80 phone calls.

75.     In colluding with Fougera and Actavis, T.P. at all times acted at the direction, and with the approval of, John Wesolowski ("Wesolowski"), Perrigo's Senior Vice President of Commercial Operations.

76.     For example, on April 13, 2010, Perrigo announced that it would be entering the market for Imiquimod Cream.  At that time, Fougera was the only other generic manufacturer of Imiquimod Cream.

77.     That same day, two senior Fougera executives exchanged the following email:

```
From:
Sent:          Tuesday, April 13, 2010 12:18 PM
To:            Walt Kaczmarek
Subject:       Re: New imiquimod pricing model


I think its clear we need to keep:

1) Walgreens
2) CAH
3) McKesson

Let Perrigo have:

1) CVS
2) ABC
3) W or RA
```

78.    Kaczmarek then called the Fougera sales executive who had a collusive relationship with T.P. at Perrigo.  The Fougera sales executive in turn called T.P.

79.    The next business day, April 19, 2010, an internal email was circulated within Perrigo stating:  "Due to Fougera's price change on Friday, we are changing our AWP & WAC for Imiquimod."

80.    Phone records obtained by the Attorney General of Connecticut detail communications between Perrigo and Fougera on that day:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/19/2010 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 16:04:44 | 0:05:51 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:16:56 | 0:00:26 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 16:34:36 | 0:03:48 |
| 4/19/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:39:16 | 0:07:13 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:48:29 | 0:03:42 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 16:52:43 | 0:03:16 |
| 4/19/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:54:33 | 0:08:49 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 16:56:29 | 0:06:39 |

81.     Between April 24 and April 27, 2010, executives from Perrigo and Fougera attended the annual meeting of NACDS in Palm Beach, Florida, where they discussed Perrigo's launch of Imiquimod Cream.

82.     As a result of Fougera's and Perrigo's agreement to divide up the market, rather than driving down the price of Imiquimod Cream, Perrigo was able to enter the market for Imiquimod Cream at a price slightly higher than the price charged by Fougera.

83.     The following month, Fougera prepared an internal presentation about Imiquimod Cream.  In that presentation, Fougera represented that "Perrigo is satisfied with 35-40% market share."  When one Fougera employee asked another why Perrigo would be satisfied with a minority share of the market, the other employee replied via email:  "Our assumptions on Perrigo share are driven from competitive intelligence at the field level.  To answer your question as to why they would stop, ***any further attempts to gain share would result in driving prices down (D&A up) and no one wins in that scenario***."

84.     On February 28, 2011, a third pharmaceutical company, Sandoz, received regulatory approval to enter the Imiquimod Cream market.  T.P. at Perrigo and the Fougera sales executive spoke five times by cell phone that day and three more times the next day.

85.     Over the next few days, both Perrigo and Fougera declined to bid against Sandoz with respect to two customers so that Sandoz could start to obtain its "fair share" of the Imiquimod Cream market.  Once Sandoz had recruited enough of Perrigo's and Fougera's Imiquimod Cream customers, it declared that it had "reached [its] share goal with this and [was] not pursuing more share."

86.     On April 15, 2011, a fourth manufacturer, Taro, received FDA approval to market Imiquimod Cream.   This caused Perrigo and Fougera to coordinate about how they would relinquish market share to Taro to sustain pricing levels.

87.     On April 18, 2011, the following phone calls took place:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/18/2011 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 12:17:23 | 0:00:27 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 16:43:08 | 0:04:09 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:56:57 | 0:02:44 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 17:00:05 | 0:00:08 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 17:08:22 | 0:03:25 |
| 4/18/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 21:41:15 | 0:06:03 |

88.     On April 21, 2011, a sales executive at Fougera reached out to a sales executive at Taro via phone.   After the call concluded, the sales executive at Fougera sent a text message to T.P. at Perrigo.

89.     On July 5, 2011, as Taro was entering the Imiquimod Cream market, there was another series of calls between Perrigo, Fougera, and Taro:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/5/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 9:12:00 | 0:02:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 9:13:00 | 0:01:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 9:18:00 | 0:06:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:23:00 | 0:02:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 9:25:00 | 0:02:00 |

90.     The three companies then had another set of calls on July 26, 2011, after Perrigo's customer, MedCo, informed Perrigo that it had received an offer for Imiquimod Cream and asked if Perrigo could match the price:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/27/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 5:52:47 | 0:00:25 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:19:00 | 0:05:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:39:00 | 0:01:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:40:00 | 0:05:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:55:00 | 0:01:00 |
| 7/27/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 7:00:17 | 0:00:25 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 7:27:00 | 0:08:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 7:40:00 | 0:04:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:06:05 | 0:04:17 |

91.     The next day, on July 28, 2011, Perrigo declined to bid to retain the MedCo business.

92.     The goal of all of these communications between Fougera, Perrigo, Sandoz, and Taro was to avoid competition and to minimize any price decreases on Imiquimod Cream that would typically come with the entry of new competitors.

93.     The State AGs' complaint contains numerous details of similar collusive conduct between Perrigo and other manufacturers of generic drugs that occurred in the 2010 to 2012 timeframe, and that were designed to prevent price erosion (and in some cases increase prices) and to avoid competition on at least the following drugs:

- Triamcinolone Acetonide Cream and Ointment

- Adapalene Cream

- Betamethasone Dipropionate Lotion

- Erythromycin Base/Ethyl Alcohol Solution

- Nystatin Ointment

94.     Perrigo's conduct with respect to Nystatin Ointment was particularly egregious.

95.     In early 2011, Perrigo and Fougera were the only two pharmaceutical companies that manufactured generic Nystatin Ointment.

96.     In February 2011, Perrigo and Fougera colluded to raise the price of Nystatin Ointment.  T.P. at Perrigo and the sales executive at Fougera had more than two dozen cell phone calls to devise a plan to increase the price of Nystatin Ointment.

97.     Perrigo and Fougera agreed that Fougera would temporarily exit the Nystatin Ointment market.  As the only manufacturer of generic Nystatin Ointment, Perrigo would then be able to raise the price of the drug.  After Perrigo had implemented the price increase, Fougera would re-enter the market, but would not underbid Perrigo so that the price increase was sustained.

98.     The plan went off without a hitch.  Fougera discontinued its production of Nystatin Ointment on March 15, 2011.  Several of Fougera's customers for Nystatin Ointment then switched to Perrigo.

99.     On June 1, 2011, Perrigo instituted a large price increase on Nystatin Ointment, increasing the price on a 15gm tube *by 493%*, and the price on a 30gm tube *by 269%*.  With no competition, Perrigo's customers were helpless and had to accept the price increases.

100.    Perrigo's price increase attracted other former manufacturers of Nystatin Ointment beyond Fougera to re-enter the market.  Specifically, Actavis also decided to re-enter the market at the newly hiked price point.

101.    As Fougera and Actavis rejoined the Nystatin Ointment market, the three manufacturers were in constant contact with each other in order to divide the market without undoing the carefully orchestrated price increases.   Perrigo, Fougera, and Actavis exchanged pricing data, and agreed to market the Nystatin Ointment products at the same price as each other.

102.    When Fougera and Actavis rejoined the market, they did so at the monopolistic prices set by Perrigo.

### 2. Collusive Price Increases Between 2012 and 2016

103.    In late 2012 there was a shakeup in the topical generics industry when Sandoz purchased Fougera and several Actavis senior executives joined Perrigo and Taro.

104.    In December 2012, Douglas Boothe left Actavis ad became the Executive Vice President and General Manager of Perrigo.

105.    One month later, in January 2013, Michael Perfetto left Actavis and became the Chief Commercial Officer of Taro.

106.    Two months later, in March 2013, Ara Aprahamian left Actavis and became Vice President of Sales and Marketing at Taro.

107.    These former colleagues used their new senior executive positions with different companies to collude with each other on overlapping products.

108.    Between January 2013 and January 2016, Boothe (at Perrigo) and Perfetto (at Taro) exchanged over one hundred phone calls to collude on pricing.

109.    Although T.P.'s contact at Fougera was let go as a result of the Sandoz acquisition, T.P. forged a new collusive relationship with another senior sales executive at Sandoz.

110.    T.P. and his new Sandoz contact were not friends.  They communicated solely for the purpose of facilitating collusion between Perrigo and Sandoz by exchanging information about price increases and market share.   They communicated only by cell phone, and never in writing, to avoid detection.   When they were communicating with each other, it was to coordinate anticompetitive conduct with regard to drugs on which Sandoz and Perrigo overlapped.

111.    Between August 2012 and February 2016, there were almost 100 such communications between T.P. and the senior sales executive at Sandoz.

112.    In colluding with Sandoz, T.P. acted at the direction of, or with the approval of, Perrigo senior executives Boothe and Wesolowski.

113.    In addition to Taro and Sandoz, Perrigo had a collusive relationship with G&W during this period.

114.    Kurt Orlofski, the President of G&W, had over 75 communications with individuals at Perrigo, including with Wesolowski and Boothe.

115.    Erika Vogel-Baylor, the Vice President of Sales and Marketing at G&W, had almost 100 communications with T.P. at Perrigo during this time period.

116.    In September and October 2012, Perrigo and G&W coordinated a price increase on Halobetasol Cream and Ointment.  T.P. at Perrigo and Vogel-Baylor at G&W shared a mutual contact at Aurobindo Pharma ("Aurobindo").  Although Aurobindo did not manufacture Halobetasol Cream and Ointment, Perrigo and G&W used Aurobindo as a conduit for their collusion.  These communications are reflected in the following table:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 10:16:11 | 0:00:00 |
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 10:17:50 | 0:00:00 |
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 10:18:49 | 0:00:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:44:00 | 0:01:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:45:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:48:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:52:00 | 0:03:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:54:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:57:00 | 0:02:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 14:03:00 | 0:02:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 14:04:00 | 0:02:00 |

117.    On September 19, 2012, T.P. reported back to Wesolowski.

118.    Another series of calls followed two days later:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 6:30:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:53:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:56:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:58:00 | 0:01:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 7:04:00 | 0:02:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 7:06:00 | 0:02:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 11:53:00 | 0:15:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:02:00 | 0:04:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 4:06:00 | 0:01:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 4:11:00 | 0:03:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:16:00 | 0:03:00 |

119.    In November 2012, a customer reached out to G&W to see if it could offer a better price on Halobetasol Cream and Ointment than Perrigo.  More communications followed, with Aurobindo again acting as a conduit between Perrigo and G&W:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:03:00 | 0:03:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:05:00 | 0:05:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:09:00 | 0:04:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:13:00 | 0:01:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:38:00 | 0:02:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 6:41:00 | 0:01:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:42:00 | 0:03:00 |

120.    Later that day, Vogel-Baylor emailed a sales executive at G&W and instructed him not to underbid Perrigo:



From:
ERIKA VOGEL <evogel@gwlabs.com>
To:

Date:
Tue, 06 Nov 2012 18:15:44 +0000

We cannot take this from Perrigo so I will give you pricing so that it looks like you are making an attempt to bid:

15gm - $18.06
50gm - $44.99

Thanks,
Erika

121.    In March and April 2013, Perrigo and G&W again colluded to increase the price of Halobetasol Cream and Ointment.  This time, Boothe at Perrigo reached out to Orlofski at G&W, speaking seven times on March 26, 2013.

122.    On March 27, 2013, Perrigo raised its price on Halobetasol Cream and Ointment *by over 250%*.  Two weeks later, G&W also raised its price.

123.    During that same time frame, Perrigo and G&W also colluded to increase the price of Prochlorperazine Maleate Suppositories.  Orlofski and Boothe first discussed the price increase at a lunch at an Italian restaurant in Piscataway, New Jersey on March 1, 2013.

124.    On March 19, 2013, G&W implemented a 200% price increase on Prochlorperazine Maleate Suppositories.  That same day, Boothe and Orlofski spoke three times via phone.

125.    On April 11, 2013, Perrigo announced that it was raising the price on Prochlorperazine Maleate Suppositories *by 200%*, from $38.85 to $104.55.

126.    In May 2013, Taro instituted a number of price increases on twelve different products, as set forth in the following table:

| PRODUCT DESCRIPTION | LARGEST % WAC INCREASE | COMPETITORS |
|---|---|---|
| Alclometasone Dipropionate 0.05% Topical Cream | 223% | Sandoz, Glenmark |
| Ammonium Lactate 12% Topical Cream | 97% | Perrigo, Actavis |
| Ammonium Lactate 12% Topical Lotion | 88% | Perrigo, Actavis |
| Betamethasone Dipropionate (Augmented) 0.05% Topical Lotion | 29% | Sandoz |
| Betamethasone Dipropionate 0.05% Topical Cream | 10% | Sandoz, Actavis |
| Betamethasone Valerate 0.1% Topical Cream | 44% | Sandoz, Actavis |
| Carbamazepine 400mg Extended-Release Tablet | 43% | Sandoz |
| Carbamazepine 100mg/5ml Suspension | 18% | Wockhardt |
| Clomipramine Hydrochloride 75mg Capsule | 3441% | Sandoz, Mylan |
| Desonide 0.05% Topical Cream | 703% | Perrigo, Actavis (entered in Aug. 2013) |
| Desonide 0.05% Topical Ointment | 501% | Perrigo, Sandoz (entered in Jan. 2014) |
| Terconazole 3 Day 0.8% Vaginal Cream | 55% | Sandoz, Actavis |

127.    In advance of these price increases, Taro colluded with other manufacturers of the drugs, including Perrigo.

-27-

128.    The following tables show phone conversations between Perrigo and other manufacturers concerning these price increases:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/5/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 14:36:00 | 0:30:00 |
| 4/9/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | M.D. (Actavis) | 14:50:00 | 0:19:00 |
| 4/11/2013 | Voice | M.D. (Actavis) | Incoming | T.P. (Perrigo) | 12:35:34 | 0:00:29 |
| 4/12/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 13:02:12 | 0:00:56 |
| 4/12/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 13:12:00 | 0:25:00 |
| 4/15/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 3:59:00 | 0:01:00 |
| 4/15/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 11:00:00 | 0:08:00 |

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 10:28:00 | 0:13:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 10:41:00 | 0:01:00 |
| 4/19/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:13:00 | 0:01:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:30:00 | 0:09:00 |
| 4/20/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 5:12:00 | 0:01:00 |
| 4/20/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 7:24:00 | 0:01:00 |
| 4/20/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 10:44:00 | 0:02:00 |
| 4/20/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 11:48:00 | 0:02:00 |
| 4/20/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 11:49:00 | 0:02:00 |
| 4/22/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 5:43:00 | 0:04:00 |
| 4/22/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 7:00:00 | 0:01:00 |
| 4/22/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 13:42:00 | 0:08:00 |
| 4/23/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.G. (Actavis) | 11:51:00 | 0:02:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 7:42:00 | 0:01:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.G. (Actavis) | 7:52:00 | 0:02:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:34:00 | 0:05:00 |
| 4/25/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:43:00 | 0:01:00 |
| 4/26/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 7:30:00 | 0:08:00 |

129.    Between April 20 and April 23, 2013, representatives of Perrigo attended the NACDA annual meeting in Palm Beach, Florida.  Representatives from Taro, Sandoz, Actavis, Mylan Pharmaceuticals ("Mylan"), G&W, and Glenmark Pharmaceuticals also attended.  These executives had dinners together and attended common social events, such as wine tastings.

130.    One week later, Taro implemented the pricing increases.

131.    Perrigo and the other manufacturers declined to bid on Taro's customers after these price increases were implemented.  Rather than compete, Perrigo worked on implementing price increases of its own.  The other manufacturers did the same.

132.    On May 21, 2013, Perrigo followed Taro's price increases on Desonide Cream and Desonide Ointment.

133.    Actavis re-entered the Desonide market on August 15, 2013, matching Taro's and Perrigo's prices.

134.    The following table shows the communications between Perrigo, Taro, and Actavis around those two key dates:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/10/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 4:38:00 | 0:02:00 |
| 5/10/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | T.D. (Actavis) | 4:41:00 | 0:11:00 |
| 5/10/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 4:56:00 | 0:17:00 |
| 5/22/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 9:22:00 | 0:02:00 |
| 5/22/2013 | Voice | M.D. (Actavis) | Incoming | T.P. (Perrigo) | 12:32:20 | 0:00:19 |
| 5/22/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 12:46:00 | 0:14:00 |
| 5/23/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 11:01:47 | 0:24:02 |
| 8/7/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 4:47:00 | 0:02:00 |
| 8/7/2013 | Voice | Perfetto, Mike (Taro) | Incoming | Boothe, Douglas (Perrigo) | 10:33:00 | 0:13:00 |
| 8/7/2013 | Voice | Boothe, Douglas (Perrigo) | Incoming | Falkin, Marc (Actavis) | 14:52:00 | 0:11:00 |
| 8/8/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 6:32:00 | 0:06:00 |
| 8/8/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 9:24:00 | 0:03:00 |
| 8/8/2013 | Voice | M.D. (Actavis) | Incoming | T.P. (Perrigo) | 9:25:00 | 0:03:00 |
| 8/8/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 9:28:00 | 0:05:00 |
| 8/9/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 10:39:00 | 0:03:00 |
| 8/16/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.B. (Actavis) | 7:13:00 | 0:09:00 |

135.    On July 30, 2013, Perrigo followed Taro's price increases on Ammonium Lactate Cream and Ammonium Lactate Lotion.

136.    In June 2013, Perrigo and G&W were the only manufacturers of Hydrocortisone Acetate Suppositories.  This was G&W's top-selling product, and Perrigo's second-best selling product.  By 2016, Hydrocortisone Acetate Suppositories accounted for almost $100 million in annual sales for Perrigo.

137.    Between June 27 and June 30, 2013, representatives from Perrigo and G&W attended the McKesson ideaShare trade show in Las Vegas, Nevada.

138.    In early July 2013, both Perrigo and G&W implemented price increases on Hydrocortisone Acetate Suppositories.  Perrigo increased the price *by 473%*, which essentially matched G&W's price increase.

139.    In August 2013, Perrigo took the lead in raising the price on a number of different products:  Ciclopirox Solution, Hydrocortisone Valerate Cream, and Promethazine HCL Tablets.

140.    Perrigo raised the price on Ciclopirox Solution *by 60%*.

141.    Perrigo raised the price on Hydrocortisone Valerate Cream *by 351%*.

142.    Each of these price increases was implemented in coordination with Perrigo's so-called competitors.

143.    For example, on August 7 and August 8, 2013, Boothe had numerous phone calls with Perfetto at Taro about raising the price on Hydrocortisone Valerate Cream.

144.    In mid-2014, Perrigo and the other manufacturers implemented another set of price increases.

145.    Perrigo and G&W again colluded to raise the price on Hydrocortisone Acetate Suppositories.   On July 24, 2014, Perrigo increased the price of Hydrocortisone Acetate Suppositories *by 235%*.  G&W followed suit about a week later.  T.P. at Perrigo spoke with Vogel-Baylor at G&W on August 11 and on August 18, 2014.

146.    In June 2014, Perrigo began planning a price increase on Econazole Nitrate Cream.

147.    On June 17, 2014, Boothe had a 45-minute call with Perfetto at Taro, which was one of the other two manufacturers that produced Econazole Nitrate Cream.  Boothe and Perfetto exchanged numerous calls between July 18 and July 22, 2014.

148.    On July 24, 2014, Perrigo implemented a significant price increase on Econazole Nitrate Cream ranging between *637% and 735%*.  Boothe and Perfetto talked again that day.

149.    The two other manufacturers of Econazole Nitrate Cream followed suit over the following weeks.

150.    In June 2014, Taro raised the price on Hydrocortisone Valerate Cream *by 44%*, and the price of Clobetasol Propionate Gel *by 2008%*.

151.    Taro communicated with Perrigo in advance of implementing these price increases. Perfetto at Taro had four calls with Boothe at Perrigo on June 3, 2014, before implementing the price increases on Hydrocortisone Valerate Cream and Clobetasol Propionate Gel.

152.    Perrigo followed Taro's June 2014 price increase on Hydrocortisone Valerate Cream on July 24, 2014.  Immediately before Perrigo implemented this price increase, Boothe had several calls with Perfetto at Taro:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/18/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 12:10:00 | 0:01:00 |
| 7/19/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 3:51:00 | 0:01:00 |
| 7/19/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 3:52:00 | 0:02:00 |
| 7/21/2014 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 14:20:00 | 0:26:00 |
| 7/24/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 10:40:00 | 0:02:00 |
| 7/24/2014 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 15:03:00 | 0:07:00 |

153.    In October 2014, Perrigo followed Sandoz's *205%* price increase on Bromocriptine Mesylate Tablets.

154.    The only three manufacturers of Bromocriptine Mesylate Tablets were Sandoz, Mylan, and Perrigo.

155.    Sandoz spoke with T.P. at Perrigo and James Nesta, a sales executive at Mylan, prior to Sandoz implementing the price increase.

156.    Sandoz and Mylan implemented their price increases in 2013.  Perrigo did not immediately follow at that time because it had supply issues.

157.    When one customer, McKesson, complained to Sandoz that Perrigo was selling Bromocriptine Mesylate Tablets at lower prices, Sandoz reached out to T.P. at Perrigo.  T.P. assured Sandoz that Perrigo would not take McKesson's business from Sandoz, and that Perrigo was planning to follow the price increase.  Consequently, Sandoz was able to reject McKesson's request to lower the price of Bromocriptine Mesylate Tablets.

158.    On October 2, 2014, T.P. of Perrigo called his contact at Sandoz and they spoke for seven minutes.  Following that call, T.P. called Wesolowski.  A few days later, on October 7, 2014, Perrigo sent letters to its customers notifying them of its price increase on Bromocriptine Mesylate Tablets.

159.    The next day, on October 8, 2014, an internal email was circulated at Sandoz, noting that Perrigo "has finally followed [Sandoz's] Bromocriptine Price increase from April '13."

160.    In March 2014, Perrigo entered the market for Methazolamide Tablets.  At that time, the only other manufacturer of Methazolamide Tablets – Sandoz – had temporarily left the market.  Perrigo took advantage of its temporary monopoly by raising the price on Methazolamide Tablets *by 136%*.

161.    When Sandoz re-entered the market, Perrigo colluded with Sandoz to sustain the price increase.  Between June and November 2014, T.P. of Perrigo and his counterpart at Sandoz spoke several times, with T.P. relaying the substance of these conversations to Wesolowski and Boothe.  In December 2014, Sandoz followed Perrigo's price increase on Methazolamide Tablets.

162.    Perrigo's collusion with Sandoz did not just involve orchestrating anticompetitive price increases, but also allocating market share and sharing pricing information when one or both of them entered the market for a particular drug.  T.P., Wesolowski, and Boothe all coordinated with Sandoz to allocate the market for Fluticasone Propionate Lot in 2013, the market for

Clindamycin Solution in 2013, the market for Adapalene Cream in 2013 and 2014, the market for Calcipotriene Betamethasone Dipropionate Ointment in 2014, and the market for Tacrolimus Ointment in 2014.

163.    Perrigo executives directed their sales force not to breach Perrigo's agreement with Sandoz.  For example, on March 21, 2014, Omnicare reached out to Perrigo asking for a bid on Calcipotriene Betamethasone Dipropionate Ointment.  Omnicare was a Sandoz customer.  After a Perrigo sales executive forwarded Omnicare's request to Wesolowski, Wesolowski instructed the sales executive:  "This customer will not be approached."  The Perrigo sales executive then went back to Omnicare and informed it that Perrigo was "holding off on offers for now," even though Perrigo was actively sending offers to other potential non-Sandoz customers at that time.

164.    In addition to the collusive price-fixing activity revealed by the Attorney General of Connecticut, the expert in the Class Action identified unusual price increases by Perrigo and its "competitors" on two other drugs during the same time period as the price increases disclosed by the State AGs:  Permethrin Cream in mid-2011 and early 2013; and Tretinoin in early 2014.

### 3.    Price Increases Slow in the Wake of Increased Regulatory Scrutiny

165.    Perrigo and the other generics manufacturers were forced to slow the collusive price increases when they began to attract attention from government regulators.  Government regulators were concerned that the markets were for generic drugs were acting the opposite of how they were meant to act, i.e., prices for generic products appeared to be rising dramatically, rather than decreasing, after competitors entered the market.

166.    In July 2014, the Attorney General of the State of Connecticut launched an antitrust investigation into the generic drugs industry in the United States.

167.    As subpoenas were issued to a number of Perrigo's so-called competitors, Perrigo had to put a halt to the collusive price increases.

168.    However, the extent of Perrigo's involvement in this broad conspiracy did not begin

to be revealed until early 2017.

**D.      Perrigo Is Criminally Investigated**

169.    The market began to learn of Perrigo's collusive and anticompetitive conduct with

respect to its Generic Rx segment in March 2017, when it was announced that Perrigo was the

target of a criminal investigation concerning generic drug pricing.

170.    Specifically, on March 3, 2017, *Bloomberg* reported that Perrigo's name had been

raised by antitrust regulators at the Department of Justice.  The *Bloomberg* article, "Perrigo Joins

Firms With Generic Drugs Under U.S. Glare," stated in pertinent part:

> U.S. prosecutors are examining the prices of skin treatments made
> by Perrigo Co. and a handful of other companies as part of a
> sweeping criminal investigation into possible collusion in the
> generic drug business, according to a document filed in court this
> week.
>
> . . .
>
> Perrigo's shares fell 3.7 percent to close at $72.76 in New York
> trading. . . .
>
> . . .
>
> Dublin-based Perrigo, which along with the other companies said it
> will seek to dismiss the civil complaints, declined to comment on
> any government probe.
>
> "As you may expect, from time to time, Perrigo receives inquiries
> for information and documents from a variety of government
> agencies. We only disclose those inquiries if and when we feel they
> are material."
>
> . . .
>
> **New Details**
>
> The government's letter provides new details about a drug-pricing
> inquiry whose magnitude has become apparent over time, as more
> company names emerge and share prices tumble.  About a dozen
> companies have disclosed they've received subpoenas in the matter

and are cooperating, including Mylan NV, Endo International Plc,
Lannett Co. and Teva.

171.    In response to this news, Perrigo shares dropped 3.7%, down $3/share from a close

on March 2 of $75.76/share to a close of  $72.76/share on March 3, 2017.

172.    The severity of Defendants' conduct was further disclosed two months later, when

the federal government executed a search warrant in Perrigo's offices.

173.    After the close of the market on May 2, 2017, Perrigo revealed in a press release

that its offices had been raided as part of an ongoing investigation by the United States Department

of Justice into price-fixing in the pharmaceutical industry.

174.    Investors were stunned.  The raid was a far more severe measure than taken against

most other generic drug manufacturers, who merely received subpoenas.  One analyst with RBC

Capital Markets told *Bloomberg* the criminal probe into price-fixing could make it harder for

Perrigo to divest its generics business.

175.    As noted by *Bloomberg*, shares of Perrigo "slumped" as a result of the

announcement of the raid.  On May 3, 2017, Perrigo's shares closed down over 5%, or $3.88 per

share, from a close on May 2 of $76.23/share to a close on May 3, 2017, of $72.35/share.

## V.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS

176.    During the relevant period, Defendants made materially false and misleading

statements, and omitted to disclose material information, concerning Perrigo's Generic Rx

business.  In particular, Defendants falsely attributed the success of that sector to legitimate

business practices and emphasized the competition for generic products when, in fact, Perrigo had

been colluding with other manufacturers to thwart competition and to increase prices on generic

drugs.  And when increased regulatory scrutiny prohibited Perrigo from continuing to increase

prices, Perrigo failed to disclose that dwindling margins in the Generic Rx business were the result

of the difficulty it was experiencing replicating collusive price increases in the face of such scrutiny.

177.    On February 25, 2016, Perrigo filed a report with the SEC on Form 10-KT for the six-month period ending December 31, 2015 (the "2015 Year-End Report").  The 2015 Year-End Report was signed by, among others, Defendants Papa and Brown.  In the 2015 Year-End Report, Defendants falsely stated that, as a manufacturer of generic versions of brand-name drugs, Perrigo "operate[d] in a highly competitive environment" and "face[d] vigorous competition from other pharmaceutical companies that may threaten the commercial acceptance and pricing of [Perrigo's] products."

178.    These statements were materially false and misleading because Perrigo's Generic Rx division did not operate in a "highly competitive environment" or face "vigorous competition" for many of its key products, but instead operated in an environment where prices had been fixed with other generic drug manufacturers at artificially high prices to garner collusive revenues that would not be possible in a competitive market.

179.    On May 12, 2016, Perrigo announced its financial results for the first quarter of 2016 results and held a conference call (the "First Quarter 2016 Earnings Call") during which Defendant Brown made the following materially false and misleading statements:

> <**Judy Brown**>: . . . Rx net sales increased 2%, which came in below our expectations.  We experienced negative organic growth within the segment resulting from several factors.  So, let me explain.  The change in the competitive landscape was much more disrupt[ive] to our plan than ha[d] been anticipated and impacted our overall pricing strategies for the segment.
>
> During the quarter, we experienced 24 competitive launches against our portfolio, producing ***sharp price erosion*** in a number of topical products we sell.  These factors, combined with ***continued pricing pressure*** due to the consolidation of the large buying cooperative groups and the absence of significant new products in the quarter, ***further impacted our ability to execute on our planned pricing***

*strategies*. Despite all of this, however, the team was able to maintain its extended topical leadership position in the quarter. These ***pricing pressures*** impacted both the adjusted gross and operating margins, accounting for the decline you see here year-over-year.

. . .

<Question – **Chris Schott**>: And if I can just sneak in a quick follow-up on just the Rx business, and Judy, sorry to re-ask this, but I'm still just not clear exactly why. But why isn't the business seeing more margin erosion given the competitive dynamics and pricing? It seems like many of your peers were seeing pricing competition that's translating to very steep margin erosion. And just I'm trying to understand why that isn't the case with Perrigo, and then I would think lower price would drive down margins here. Thanks so much.

<Answer – **Judy Brown**>: And we've had the acquisitions completed at the end of 2015 and beginning of 2016, which have contributed attractive margins to the basket, as well. So on a year-over-year basis, there are pluses and minuses. On a quarter-over-quarter basis, there were the ***pricing pressures*** that we spent a lot of time on already this morning, offset in large part from the margin perspective with the acquired products. So the basket's still working in the portfolio. On a margin perspective, it's still working well.

180.   These statements were materially false and misleading when made because they omitted that: (a) the generic drug pricing had been favorable in prior years because Perrigo had been able to dramatically raise prices in select generic drugs by colluding with so-called competitors; and (b) the "sharp price erosion" and "continued pricing pressure" were actually the natural result of increased scrutiny by regulators and others into collusion among generic drug manufacturers, and the increased difficulty of replicating price increases in the face of such scrutiny.

181.   In its May 16, 2016 press release (the "2016 First Quarter Earnings Release"), Perrigo falsely stated that "the Rx segment delivered strong margins in an increasingly challenging pricing and competitive environment," and that "[f]irst quarter adjusted operating income of $117

million decreased by 3% compared to the prior year, primarily driven by industry pricing and competitive pressures."

182.    These statements were materially false and misleading when made because they omitted that: (a) the generic drug pricing had been favorable in prior years because Perrigo had been able to dramatically raise prices in select generic drugs by colluding with so-called competitors; and (b) the "increasingly challenging pricing and competitive environment" and the "industry pricing and competitive pressures" were actually the natural result of increased scrutiny by regulators and others into collusion among generic drug manufacturers, and the increased difficulty of replicating price increases in the face of such scrutiny.

183.    In its quarterly report filed with the SEC for the first quarter of 2016 on May 16, 2016, which was signed by Defendant Brown (the "2016 First Quarter Report"), Perrigo falsely stated that it had experienced "a recent reduction in pricing expectations in our U.S. businesses from historical patterns, in particular in our Rx segment due to industry and competitive pressures in the sector," which it attributed in part to "competition in specific product categories."

184.    These statements were materially false and misleading when made because they omitted that: (a) the generic drug pricing had been favorable in prior years because Perrigo had been able to dramatically raise prices in select generic drugs by colluding with so-called competitors; (b) the "recent reduction in pricing expectations . . . due to industry and competitive pressures in the sector" and the "competition in specific product categories" were actually the natural result of increased scrutiny by regulators and others into collusion among generic drug manufacturers, and the increased difficulty of replicating collusive price increases in the face of such scrutiny.

185.    On June 21, 2016, Defendant Brown participated in the UBS Global Healthcare Conference and made the following materially false and misleading statements:

> **<Question – Marc Goodman**>:   Switching gears just to the generics business for a second, I'm curious. Maybe, Judy, you're the right person for this.  If we were trying to tease out the difference between the new lower sales guidance, what part of it came from the consortiums getting tougher just in general versus typical product-specific pricing issues that you're just going to have because of competition? Like, how do we tease that out?  Can you quantify the pricing pressure that's being put on by these consortiums?
>
> **<Answer – Judy Brown**>:  So, of the total guidance change, if you go midpoint to midpoint on our guidance range and you back up into operating income movement as a proxy for the EPS change, over half of that align move came from Rx.
>
> And the majority of that is coming not through operating expenses, but it's coming through the pricing and timing on new products just being adjusted from the original guidance, mostly though pricing related.
>
> So, now, if you're trying to say, of that basket, how much is pressure versus specific pricing initiatives, in some cases, one could say that they're intrinsically linked.  What do I mean? We saw a dynamic in Q1 of products being launched against us when we didn't have our product launches right at that time.  ***So, we saw some competitive pressure***.  We'll have our products launching later in the year, but we got the pressure at this point and weren't ready with our own launches at that moment.
>
> Now, you start to say: Okay. ***Now, we're seeing a different pricing dynamic for the remainder of the year***.  We have some price increases slated over the rest of the calendar year.
>
> How do we feel?  Are those really going to happen?  Are we going to have some pressure on being able to execute against that tactical plan in our price increases?  Will there be challenges?  So, is that directly pricing pressure from the consortia, or is it really a situation of indirect?  And is it our own reticence perhaps to be able to execute on those specific actions?
>
> So, they're linked.  So, you think, of the changing guidance, more than   half   is   Rx.    And   of   those   changes,  ***it's linked to the environment***.  It's linked to how well we'll be able to execute on

those remaining plans because of the environment, as well as some things, the dynamic that happened in Q1 that flows through, obviously, for the rest of the year.

186.   These statements were materially false and misleading when made because they omitted the following information necessary to make the statements not misleading under the circumstances in which they were made: (a) the generic drug pricing had been favorable in prior years because Perrigo had been able to dramatically raise prices in select generic drugs by colluding with so-called competitors; and (b) the "competitive pressure" and "different pricing dynamic for the remainder of the year" were actually the natural result of increased scrutiny by regulators and others into collusion among generic drug manufacturers, and the increased difficulty of replicating price increases in the face of such scrutiny.

187.   In July 2016, the *Wall Street Journal* published an article about Defendant Papa's hiring as the new CEO of Valeant (the "July 2016 WSJ Article").  In that article, it was noted that Perrigo had raised the prices on several generic drugs in 2013 and 2014.  In response to those allegations, Defendant Perrigo and Defendant Papa were quoted as follows:

> Perrigo says competition from other generic drug companies making the same drugs played a role in its price increases.  The products on which it raised prices are "***in competitive markets . . . and like any business we take our competitors' pricing into account***," a Perrigo spokeswoman said.
>
> Mr. Papa said the list-price increases are misleading, because they don't reflect what is paid after Perrigo provides discounts.  Mr. Papa wouldn't provide information on how much prices rose after discounts, saying that was confidential.
>
> Prescription drugs accounted for a relatively small portion of Perrigo's revenue—roughly 20%—and ***prices were "flat to up slightly" across the entire portfolio***, he said, including store-brand infant formula and over-the-counter drugs as well as generics.

188.   These statements were materially false and misleading when made because they omitted the following information necessary to make the statements not misleading under the

circumstances in which they were made: (a) Perrigo operated in an environment where prices had been fixed with other generic drug manufacturers at artificially high prices to garner collusive revenues that would not be possible in a competitive market; and (b) pricing was not "flat to up slightly," but rather Perrigo had wildly increased pricing in select generic drugs where it could fix the market price in collusion with competitors and/or join an existing price-fixing conspiracy.

189.    In its quarterly report filed with the SEC for the second quarter of 2016 on August 10, 2016, which was signed by Defendant Brown (the "2016 Second Quarter Report"), Perrigo falsely stated that it had experienced "a reduction in pricing expectations during 2016 in comparison to historical patterns in our U.S. businesses, in particular in our Rx segment, due to industry and competitive pressures in the sector," which it attributed in part to "competition in specific product categories."

190.    The statements were materially false and misleading when made because they omitted that: (a) the generic drug pricing had been favorable in prior years because Perrigo had been able to dramatically raise prices in select generic drugs by colluding with so-called competitors; (b) the "reduction in pricing expectations . . . due to industry and competitive pressures in the sector" and the "competition in specific product categories" were actually the natural result of increased scrutiny by regulators and others into collusion among generic drug manufacturers, and the increased difficulty of replicating collusive price increases in the face of such scrutiny.

191.    In its quarterly report filed with the SEC for the third quarter of 2016 on November 10, 2016, which was signed by Defendant Brown (the "2016 Third Quarter Report"), Perrigo falsely stated that it had experienced "a reduction in pricing expectations during 2016 in comparison to historical patterns in our U.S. businesses, in particular in our Rx segment, due to

industry and competitive pressures in the sector," which it attributed in part to "competition in specific product categories."

192.    The statements were materially false and misleading when made because they omitted that: (a) the generic drug pricing had been favorable in prior years because Perrigo had been able to dramatically raise prices in select generic drugs by colluding with so-called competitors; (b) the "reduction in pricing expectations . . . due to industry and competitive pressures in the sector" and the "competition in specific product categories" were actually the natural result of increased scrutiny by regulators and others into collusion among generic drug manufacturers, and the increased difficulty of replicating collusive price increases in the face of such scrutiny.

## VI.    ADDITIONAL ALLEGATIONS OF SCIENTER

193.    Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

194.    Defendants Papa and Brown acted with scienter with respect to the materially false and misleading statements of material fact set forth above because they knew, or at the very least recklessly disregarded, that those statements were false when made.  As the most senior executives of Perrigo during the relevant time period, their scienter is imputable to Perrigo.

195.    *First*, the results of a multi-year government investigation demonstrate Defendants' scienter.

196.    In July 2014, the State of Connecticut initiated a non-public investigation into suspicious price increases for certain generic pharmaceuticals.  Over time, the investigation expanded, and the Connecticut Attorney General was joined in its efforts by more than 50 additional states and U.S. territories.

197.     In June 2020, these governmental entities filed a complaint against, among others, Perrigo and two of its senior executives in charge of the Generic Rx segment during the relevant period – Douglas Boothe and John Wesolowski.  The complaint is over 500 pages in length.  It sets forth, in great detail, how Perrigo and other manufacturers significantly raised prices on a number of generic drugs by "***consistently and systematically, over a period of several years, engag[ing] in contracts, combinations, and conspiracies that had the effect of unreasonably restraining trade, artificially inflating and maintaining prices, and reducing competition in the generic pharmaceutical industry throughout the United States***."

198.     In advance of the filing of the State AGs Action, the Connecticut Attorney General's investigatory powers allowed it to obtain thousands of documents, millions of phone records, and to interview an untold number of cooperating witnesses in order to bring its antitrust suit against Perrigo and others in connection with the U.S. generic drug market.

199.     Based on internal Perrigo documents and insider testimony, the State AGs Action compiled a tome that is replete with allegations conclusively establishing that the price-hiking scheme was conducted with the knowledge, and at the behest, of Perrigo's executives.

200.     Indeed, according to the State AGs Action, "***executives and others at the highest levels*** in many of the Defendant companies . . . ***conceived, implemented, directed, and ultimately benefited financially from these schemes***."  Thus, Perrigo's senior executives were well aware of the collusion, but elected to conceal it from investors.

201.     *Second*, Defendants Papa and Brown both claimed to have personal knowledge of Perrigo's generic drug pricing strategy, and the pricing environment of other manufacturers, indicating that they would have inescapably learned of the highly unusual, coordinated price hikes alleged herein.

202.    For example, on May 12, 2015, Defendant Papa attended the Bank of America Merrill Lynch Health Care Conference, and stated as follows:

> **<Q>**:  Great. So, you and IG [Farben (a German pharmaceuticals conglomerate)] both have a Rx product that you both benefited from a price increase, and recently decreased price, and IG's made some comments as to what they think you're doing.  But it seems to be there may be some pricing strategy you created around your Rx products to address a certain customer demand or go after a certain group of customers.  I was wondering if you could just elaborate on what the strategy may be there.
>
> **<A - Joseph C. Papa>**:  Sure. I'm not going to comment specifically on this particular product conflict or product opportunity, you'd say. Obviously, it's a competitive market out there.  There is always going to be – in a pricing world, somebody is going to gain some share, somebody is going to lose some share.  ***I think, as a general rule, what I've tried to do with pricing at Perrigo in the eight years, nine years I've been a part of the company is to keep pricing flat to up slightly.*** And if I do that, I believe that puts me in the best long-term position to deliver shareholder value for the company.  A[n]y specific product conflict issue is just a normal part of give and take in terms of market share, gaining market share, losing market share.  Right now, as I sit here today, Perrigo is the leader in what I would call extended topical. So anything that's absorbed topically – dermatology, respiratory, nasal, ophthalmic, we've got a leading position there.  ***And I think we're just going to certainly try to continue to make good decisions on that pricing, because I think as you've seen in our business, we've been able to drive some very significant growth, both on the top-line and the bottom-line for the company relative to our operating margins in the mid-40%s.***

203.    Similarly, during a conference call on August 5, 2015, Defendant Papa stated:

> **<Q - Marc Goodman>**: . . .  And third, in the generics business, just remind us of where we are in this price increase dynamic and how sustainable you feel like those increases are? Thanks.
>
> **<A - Joseph C. Papa>**: . . .  I'm going to go to your third part on generics and pricing and then I'll go back to Judy for the second one. ***On the generics and the pricing environment, our team has done a great job at looking at pricing***. . . .
>
> Across that portfolio we think there are still opportunities to do pricing.  We will continue to look at it.  We think there's something that we'll be talking about in the future for pricing.  But I think it

really supports the strength of that operating profit line of 49.5% of what we achieved with our Rx business in the quarter. And importantly, the gross profit line of 64.8%. For those reasons, we think we've got a strong Rx business and *we look to still find some additional pricing opportunities for the future*.

204.    On October 22, 2015, Perrigo held a conference call to announce its financial results for the third quarter of 2015. During that call, Defendant Papa made the following statement in response to an analyst question regarding generic drug pricing:

> **<Q - Elliot Wilbur**>: . . . And then, maybe more importantly, obviously, financial markets have become very concerned about the price inflation component of growth also on the generic and brand side going forward. And certainly, the generic topical business has been one of the few segments of generic industry that has really benefited from a strong overall pricing dynamic. And just thinking about 8% to 10% growth next year, how much do you think that is going to be driven by price? Or do you think we've kind of hit an inflection point maybe where growth metrics are going to be far less dependent on price and maybe we're looking at the potential negative impact on price going forward in that segment? Thanks.

> **<A - Joseph C. Papa**>: Okay. So I think, Elliot, you've had about three or four things I want to comment on. . . .

> ***On the question on pricing, certainly, we see that out in the marketplace. But I would remind the audience today that what we've always said about pricing is that our pricing across our total book of business is flat to up slightly. While there may be a product that we do raise the price on, there are other products we're taking price down. Our total strategy for pricing, as I have said I think on numerous calls, is keep pricing flat to up slightly, which means that yes, some products we may attempt to the raise price there, but in another products we're bringing the price down.*** So think about us as keeping pricing flat to up slightly as really the way we're going to look at our total portfolio.

> Whether we're talking about any specific product or any specific category or any segment of our business, the overall comment is flat to up slightly for our pricing. And I think that's really the best place for the long, sustainable consistent approach to pricing that we've had in the past and will in the future.

205.    On January 5, 2016, Defendant Papa attended the Goldman Sachs Healthcare CEOs Conference and responded to a question as follows:

<Q>:  I want to touch upon your generic business because it has performed exceptionally well.  But it also appears, Joe, that your business has benefited from a very positive pricing environment.  I think you've acknowledged that.  How much of the growth in your business has been driven by price?  Have we hit an inflection point where growth metrics are going to be far less dependent on price?  And what happens to growth if generic pricing turns negative?  And our analyst Bob Jones is tracking prescription generic drug inflation and noting that it's turning into negative territory.  I don't know how much of that is affecting your business.  But I imagine eventually it will.

<A - Joseph C. Papa>:  About three questions or four questions – and I'll start with first one. . . .  Number one, our goal – ***I've been at Perrigo nine years.  My goal in pricing has been the same for the nine years:  try to keep my pricing flat to up slightly***.  Now, to be clear, what that means is that I'm taking some products up.  And some products can be competition and I'm taking them down. On balance, what I've tried to – what I strive very hard to achieve is what I would call pricing flat to up slightly.

Now, within a category like let's use the generic Rx products, there may be more volatility up or down in products.  Certainly there's more [in] generics than there is in my consumer business.  My consumer business has  very minimal volatility.  So that's what I've strived to accomplish.

Is there a place now as we sit here today that there's going to be less pricing? I think the answer really is -- I'm a believer in economic theory.  It all comes down to supply and demand.  In other words, if there are five players, 10 players supplying drug, I can pretty much tell you what the price points are going to be.  It's going to be your cost of goods plus 10%.  It's going to find its way down to that level.

***In a case where there's only two or three players, it's – you're going to make better margins.  And that's why we purposely tried not to be in the commodity generics but to stay in the extended topicals.***

. . .

Do I think there – the point of your question is, is there going to be more price competition in even things like dermatology?  Yeah, I do because there are some people coming in.

206.     On February 18, 2016, Perrigo announced its financial results for the fourth quarter of 2015.  In response to an analyst question, Defendants Papa and Brown stated:

<Q - Elliot Wilbur>:  Thanks.  Good morning.  Sure there'll be a lot of question on BCH, or maybe I'll actually start off and ask a question on the

Rx generics segment.  Judy, if you have the numbers available, could you give us a sense of what the full year contribution was from new products versus decline in the base?  Just looking at fourth quarter and it looks like there was about a 10% rate of decline in the base, which maybe seems a little bit higher than average, which kind of leads me into part of my question here.  It just seems like at the margin, certain segments within the generic area are seeing more pricing erosion, particularly dermatologics, and just kind of wondering how you're thinking about potential headwinds there in terms of accelerated pricing erosion in 2016. Obviously, it's been a very strong tailwind the past couple of years. Thanks.

. . .

<**A - Judy L. Brown**>:  So were you to go through and accumulate the comments we made each quarter throughout calendar 2015 on new products in Rx, new product contributed approximately $121 million over the course of those four quarters.  ***And pricing wise, we did see some pressure, give or take, in the total portfolio over the course of the year, approximately 1%***.

<**A - Joseph C. Pa**pa>:  And the latter part of your question really talks about the pricing dynamics and what we're thinking about and looking at for the future.  And I'd say the following.  Are there some incremental product competition that we're going to face?  The answer is yes.  However, what we've tried to do at the Perrigo Group is not just stay focused only on dermatology, as you know, we've moved into what I would refer to as extended topicals.  So those are things beyond just certainly dermatology, but respiratory, nasal, ophthalmic.

And with those product categories, for example, at the end of the year, we'll launch our ProAir product in terms of a metered dose inhaler for respiratory, those are the things that are giving us great strength in our Rx category.  ***And as we believe, that will give us a very high gross margin and operating margin, certainly as we think about the 2016 and beyond***.  So we like what we see in terms of our ability to launch these new products and what they mean for gross margin and operating margin.

207.    *Third*, the very nature of the price-fixing activities inflating the results of Perrigo's most profitable division supports an inference of scienter.  The price-fixing at issue lasted for years and fundamentally transformed the revenues generated by some of Perrigo's most important generic drugs.  The successful execution of this scheme required systematic coordination and top-down command and control, which could not be done without the knowledge and approval of the Company's highest-ranking executives.  Indeed, the significance of the corporate actions required

to participate in any collusive behavior – which includes raising prices for key products to the same levels near-simultaneously with multiple competitors pursuant to a collusive agreement – could not have been accomplished by low level employees acting alone.

208.    *Fourth*, the size of the scheme, from which Perrigo profited handsomely, supports an inference of scienter.  Between 2008 and 2016, Perrigo's profits from the sale of generic topical products increased ***by over 1300%***.   In its fiscal year 2015, Perrigo's Generic Rx segment's operating income was 1648% higher than it was in 2008.  The segment's net sales revenue was just over $1 billion in 2015, which was over $800 million more than it made in 2008.  This increased performance was directly tied to the price increases explained above.

209.    Indeed, as a result of these price increases, the performance of the Generic Rx segment during the relevant time period was far superior to Perrigo's other business segments. While the Generic Rx segment's operating income grew 1647%, Perrigo's operating income for all its operations when combined grew only 278%.  Similarly, while the Generic Rx segment's net sales revenue grew 521%, Perrigo's net sales revenue for all its operations when combined was only 153%.

210.    *Fifth*, the existence of parallel criminal investigation into Perrigo is indicative of Defendants' scienter.  In March 2017, it was announced that Perrigo was the target of a criminal investigation concerning generic drug pricing.   Specifically, on March 3, 2017, *Bloomberg* reported that Perrigo's name had been raised by antitrust regulators at the Department of Justice. Then, on May 2, 2017, Perrigo revealed in a press release that its offices had been raided as part of an ongoing investigation by the Department of Justice into price-fixing in the pharmaceutical industry.  The raid was a far more severe measure than taken against most other generic drug manufacturers, who merely received subpoenas.

211.    *Sixth*, Douglas Boothe, who was in charge of Perrigo's Generic Rx business, was forced to "resign" as a result of his conduct.  On July 20, 2016, a mere three months after Defendant Papa's resignation, Perrigo announced a "leadership change" in its Generic Rx division.  Boothe, who was brought in to head the division just as the collusive price hikes ramped up, was replaced.  These facts further contribute to the strong inference that senior executives of Perrigo were personally aware of, or recklessly ignored, price fixing in Perrigo's Generic Rx segment.

212.    Perrigo possessed scienter by virtue of the fact that the Individual Defendants, who acted with scienter as set forth above, had binding authority over the Company.  In addition, certain allegations herein establish Perrigo's corporate scienter based on (i) the state of mind of employees whose intent can be imputed to the Company, and/or on (ii) the knowledge of employees who approved the statements alleged herein despite knowing the statements' false and misleading nature.

## VII.    PRESUMPTION OF RELIANCE

213.    Plaintiffs intend to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made public misrepresentations or failed to disclose material facts during the relevant time period; (b) the omissions and misrepresentations were material; (c) Perrigo common stock traded in an efficient market; (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Perrigo common stock; and (e) Plaintiffs purchased Perrigo common stock between the time Defendants misrepresented or failed to disclose material facts and the time when the all of the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

214.    The market for Perrigo common stock was open, well-developed and efficient at all relevant times.  As a result of the aforementioned materially false and misleading statements, Perrigo securities traded at artificially inflated prices during the relevant period.  The artificial

inflation continued until the time the market fully came to realize the nature and extent of Defendants' misrepresentations and omissions.

215.     At all relevant times, the market for Perrigo common stock was efficient for the following reasons, among others:  (a) Perrigo filed periodic reports with the SEC; (b) Perrigo common stock was listed and actively traded on the NYSE; (c) numerous analysts followed Perrigo; and (d) Perrigo regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

216.     Plaintiffs purchased Perrigo common stock in reliance on the market price of Perrigo common stock, which reflected all the information in the market, including Defendants' misstatements.

217.     In addition, or in the alternative, Plaintiffs are entitled to a presumption of reliance pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and its progeny, because the claims asserted herein are predicated in part upon omissions of material fact that Defendants had a duty to disclose.

## VIII.  PLAINTIFFS' ACTUAL RELIANCE

218.     During the relevant period, Plaintiffs' investment in Perrigo common stock was managed by Starboard.  Starboard made the investment decisions with respect to Plaintiffs' purchases of Perrigo common stock.  Factors considered by Starboard in making such decisions included, among other things, Perrigo's financial performance and a review of the Company's strengths, weaknesses and opportunities.

219.     Prior to making the decision to purchase Perrigo's common stock, a Starboard investment analyst actually and justifiably read, reviewed and relied upon (to the extent the

referenced documents had been published at the time) the 2015 Year-End Report, First Quarter 2016 Earnings Call, 2016 First Quarter Earnings Release, 2016 First Quarter Report, UBS Global Healthcare Conference, July 2016 WSJ Article, 2016 Second Quarter Report, and 2016 Third Quarter Report, including statements concerning the Generic Rx business and drug pricing.

220.     Starboard actually and justifiably relied upon information contained in the 2015 Year-End Report, First Quarter 2016 Earnings Call, 2016 First Quarter Earnings Release, 2016 First Quarter Report, UBS Global Healthcare Conference, July 2016 WSJ Article, 2016 Second Quarter Report, and 2016 Third Quarter Report (to the extent each such document was published at the time) in making each purchase of Perrigo common stock alleged herein on behalf of Plaintiffs.

## IX.     LOSS CAUSATION

221.     In addition to the allegations herein, Defendants' fraudulent conduct directly and proximately caused Plaintiffs to suffer substantial losses as a result of purchasing Perrigo securities at artificially inflated prices during the relevant period.

222.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs.  During the time that Plaintiffs purchased Perrigo common stock, the market price of those securities was artificially inflated as a direct result of Defendants' materially false and misleading statements and their failure to disclose material information.

223.     Defendants, through each category of false and misleading statements and omissions, concealed the truth about Perrigo's Generic Rx business that materially contributed to Perrigo's financial and operational success during the relevant period.  By concealing, among other things, Perrigo's collusion with other topical generics manufacturers, that Perrigo was not competing on price, that the strategy was driving known material trends, that as the strategy failed and pricing competition increased Perrigo's financial condition was deteriorating, and that Perrigo

was in fact engaged in collusion and a central actor in an industry-wide conspiracy, Defendants

also concealed the numerous and related risks associated with their false statements and omissions,

including but not limited to, the risks that:

- the strategy was highly risky and not sustainable, and as the strategy failed, Perrigo's profits would collapse;

- by their nature, especially when done in tandem with competitors, price hikes might appear to arise from anti-competitive and/or collusive conduct and, thus, draw the attention of government investigators and law enforcement agencies, precipitating possible legal actions, civil liabilities, and criminal sanctions;

- should Perrigo's collusion with other topical generics manufacturers come under public, legislative, or law enforcement scrutiny, the viability of sustaining the inflated profits and/or implementing new price hikes would be severely undermined, and would thereby undercut a major driver of the generic segment's profit;

- if pricing pressure or competition increased, Perrigo would be far more susceptible to a rapid and material decline in inflated profits, resulting in poor financial results and undercutting reported and forecasted profits;

- upon the revelation of Perrigo's collusion with other topical generics manufacturers, the Company could be further disrupted by the termination of the senior managers who were responsible for the strategy, and by any increased difficulty in hiring qualified replacements; and

- as the collusion in fact failed over time, Perrigo's inflated profits declined, and Perrigo was prevented from making additional price increases, those trends would continue.

The concealed risks bear directly on Perrigo's ability to generate and sustain its profits and its

ability to service its debt.

224.     As a series of partial but inadequate disclosures was issued correcting the prior false

and misleading statements with respect to Perrigo's collusion with other manufacturers of topical

generics – and as the foreseeable risks previously concealed by Defendants' material

misstatements and omissions partially materialized – the price of Perrigo's stock declined precipitously, and Plaintiffs were damaged.

225.   The market began to learn of Perrigo's collusive and anticompetitive conduct with respect to its Generic Rx segment in March 2017, when it was announced that Perrigo was the target of a criminal investigation concerning generic drug pricing.

226.   Specifically, on March 3, 2017, *Bloomberg* reported that Perrigo's name had been raised by antitrust regulators at the Department of Justice.  The *Bloomberg* article, "Perrigo Joins Firms With Generic Drugs Under U.S. Glare," stated in pertinent part:

> U.S. prosecutors are examining the prices of skin treatments made by Perrigo Co. and a handful of other companies as part of a sweeping criminal investigation into possible collusion in the generic drug business, according to a document filed in court this week.
>
> . . .
>
> Perrigo's shares fell 3.7 percent to close at $72.76 in New York trading. . . .
>
> . . .
>
> Dublin-based Perrigo, which along with the other companies said it will seek to dismiss the civil complaints, declined to comment on any government probe.
>
> "As you may expect, from time to time, Perrigo receives inquiries for information and documents from a variety of government agencies. We only disclose those inquiries if and when we feel they are material."
>
> . . .
>
> **New Details**
>
> The government's letter provides new details about a drug-pricing inquiry whose magnitude has become apparent over time, as more company names emerge and share prices tumble.  About a dozen companies have disclosed they've received subpoenas in the matter and are cooperating, including Mylan NV, Endo International Plc, Lannett Co. and Teva.

227.    In response to this news, Perrigo shares dropped 3.7%, down $3/share from a close on March 2 of $75.76/share to a close of $72.76/share on March 3, 2017.

228.    The severity of Defendants' conduct was further disclosed two months later, when the federal government executed a search warrant in Perrigo's offices.

229.    After the close of the market on May 2, 2017, Perrigo revealed in a press release that its offices had been raided as part of an ongoing investigation by the United States Department of Justice into price-fixing in the pharmaceutical industry.

230.    Investors were stunned.  The raid was a far more severe measure than taken against most other generic drug manufacturers, who merely received subpoenas.  One analyst with RBC Capital Markets told *Bloomberg* the criminal probe into price-fixing could make it hard for Perrigo to divest its generics business.

231.    As noted by *Bloomberg*, shares of Perrigo "slumped" as a result of the announcement of the raid.  On May 3, 2017, Perrigo's shares closed down over 5%, or $3.88 per share, from a close on May 2 of $76.23/share to a close on May 3, 2017, of $72.35/share.

X.      **NO SAFE HARBOR**

232.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not "forward-looking statements" nor were they identified as "forward-looking statements" when made.  Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected."  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein,

Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer or director of Perrigo who knew that those statements were false when made.

## XI.   CLAIMS FOR RELIEF

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and
### Rule 10b-5
### (Against All Defendants)

233.   Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

234.   This cause of action is brought against Defendants Perrigo, Papa, and Brown for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

235.   Defendants Perrigo, Papa, and Brown both directly and indirectly used the means and instrumentalities of interstate commerce in the United States to make the materially false and misleading statements and omissions of material fact alleged herein to:  (i) deceive the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflate and maintain the market price of Perrigo common stock; and (iii) cause Plaintiffs to purchase Perrigo common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants Perrigo, Papa, and Brown took the actions set forth above.

236.   Defendants Perrigo, Papa, and Brown both directly and indirectly:  (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged

in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Perrigo common stock in an effort to artificially inflate and maintain the market prices for Perrigo common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

237.   By virtue of their high-level positions at the Company, Papa and Brown were authorized to make public statements, and made public statements on Perrigo's behalf.  These senior executives were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

238.   In addition, Defendants Perrigo, Papa, and Brown had a duty to disclose truthful information necessary to render their affirmative statements not materially misleading so that the market price of the Company's securities would be based on truthful, complete and accurate information.

239.   Defendants Perrigo, Papa, and Brown acted with knowledge or reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and disclose the facts, even though such facts were known or readily available to them.  Defendants Perrigo's, Papa's, and Brown's material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of concealing the truth with respect to Perrigo's operations, business, performance and prospects from the investing public, including Perrigo's collusion with other manufacturers to topical generic products.  By concealing these material facts from investors, Defendants Perrigo, Papa, and Brown supported the artificially inflated price of Perrigo's common stock.

240.     The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Perrigo common stock.  In ignorance of the fact that the market prices were artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by Defendants, and upon the integrity of the market in which the Company's securities trade, or upon the absence of material adverse information that was recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Plaintiffs purchased Perrigo common stock at artificially inflated prices. As a series of partial but inadequate disclosures were issued, the price of Perrigo's securities substantially declined.

241.     At the time of the material misrepresentations alleged herein, Plaintiffs were ignorant of their falsity, and believed them to be true.  Had Plaintiffs known the truth with respect to the business, operations, performance and prospects of Perrigo, which was concealed by Defendants, Plaintiffs would not have purchased Perrigo common stock, or if they had purchased such securities, they would not have done so at the artificially inflated prices that they paid.

242.     By virtue of the foregoing, Defendants Perrigo, Papa, and Brown have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

243.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages in connection with their transactions in the Company's securities.

244.     Taking into account, *inter alia,* tolling of the limitations period by the filing of the Class Action against Defendants Perrigo, Papa, and Brown, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

## COUNT II
### For Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

245.    Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

246.    This Cause of Action is asserted against Defendants Papa and Brown, and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

247.    Each of Defendants Papa and Brown was a controlling person of Perrigo within the meaning of Section 20(a) of the Exchange Act.

248.    By virtue of their high-level positions, and their ownership and contractual rights, substantial participation in, and/or awareness of, the Company's operations and/or knowledge or reckless disregard of the materially false and misleading statements filed with the SEC and disseminated to the investing public, Defendants Papa and Brown had the power to influence and control, and did in fact influence and control, directly or indirectly, the decision-making of the Company.

249.    Defendants Papa and Brown were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged herein to be materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements of cause the statements to be corrected.  In particular, Defendants Papa and Brown each had direct and supervisory involvement in the day-to-day operations of the Company, and therefore are presumed to have had the power to control or influence the particular false and misleading statements and omissions giving rise to the securities violations alleged herein.

250.    Defendants Papa and Brown culpably participated in Perrigo's violation of Section 10(b) and Rule 10b-5 with respect to Count I.

251.    By reason of the conduct alleged in Count I, Perrigo is liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Defendants Papa and Brown are liable pursuant to Section 20(a) based on their control of Perrigo.

252.    Defendants Papa and Brown are liable for the aforesaid wrongful conduct, and are liable to Plaintiffs for the substantial damages suffered in connection with their purchases of Perrigo common stock.

253.    Taking into account, *inter alia,* tolling of the limitations period by the filing of the Class Action against Defendants Papa and Brown, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests relief and judgment, as follows:

(a)    Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(b)    Awarding Plaintiffs their reasonable costs and expenses incurred in this action; and

(c)    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

The Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated: February 25, 2021

By*:*  s/ Lawrence M. Rolnick
Lawrence M. Rolnick
Marc B. Kramer
Michael J. Hampson
ROLNICK KRAMER SADIGHI LLP

1251 Avenue of the Americas
New York, New York 10020
Tel.: (212) 597-2800
Fax: (212) 597-2801
lrolnick@rksllp.com
mkramer@rksllp.com
mhampson@rksllp.com

*Counsel for Plaintiffs*

## <u>CERTIFICATION PURSUANT TO L. CIV. R. 11.2</u>

I certify that, to the best of my knowledge, the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

I certify under penalty of perjury that the forgoing is true and correct. Executed on this 25th day of February 2021.

**ROLNICK KRAMER SADIGHI LLP**

By*:*  s/ Lawrence M. Rolnick
            Lawrence M. Rolnick